**No. 25-1134**

_____

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

_____

Jane Doe,

*Plaintiff-Appellant,*

v.

City of Boston; Boston Police Department; Individual Officers, in their official capacities,

*Defendants-Appellees.*

_____

On Appeal from a Final Judgment of the
United States District Court for the District of Massachusetts
Civil Action No. 21-11062, Judge Myong J. Joun

_____

**OPENING BRIEF FOR PLAINTIFF-APPELLANT**

_____

Aderson B. Francois
GEORGETOWN LAW
  CIVIL RIGHTS CLINIC
600 New Jersey Ave.,
  NW, Suite 352
Washington, D.C. 20001
(202) 661- 6721

Lily Braafladt
Sophie Gelber
Shuyi Li
Tucker Matus

*Counsel for Plaintiff-*
*Appellant*

*Student Counsel*

April 21, 2025

# Table of Contents

Table of Contents ................................................................. i

Table of Authorities ........................................................... iv

Reasons Why Oral Argument Should Be Heard ........................................... viii

Jurisdiction ...................................................................... 1

Issues Presented ................................................................. 1

Statement of the Case ............................................................ 2

   I.     Factual Background ...................................................... 3

      A.    Doe excelled at BPD before she was raped by a fellow officer. ...... 3

      B.    After Doe reported the rape, BPD placed her on administrative leave, indefinitely confiscated her firearms, and never reinstated her to full duty. ................................................... 4

      C.    BPD refused to reinstate Doe despite two psychiatrists and one psychologist confirming her fitness for full duty. .......................... 7

      D.    When Doe continued to criticize BPD's handling of the rape investigation, BPD initiated a disciplinary investigation against her. ................................................................... 9

      E.    Following Doe's resignation, BPD sent the disciplinary record based on Doe's reports to prospective employers and recommended the *Washington Post* "attempt to put [her] in an article." ............................................................. 12

   II.    Procedural Background ................................................. 17

Standard of Review ............................................................. 20

Summary of Argument .......................................................... 20

Argument ....................................................................... 23

   I.     The district court erred because it barred Doe from using pre-2017 evidence even though that evidence was not issue precluded and was legally relevant to her actionable claims. .................... 24

      A.    The district court improperly barred Doe from litigating the issue of BPD's pre-2017 retaliation. ................................. 24

         1.    Doe never actually litigated the issue of BPD's retaliation. ...... 27

2.    Whether BPD retaliated against Doe was not essential to the state court's judgment that her complaint should be dismissed due to late service.............................................................28

B.    The district court refused to consider how pre-2017 evidence of retaliation and animus proves BPD's post-2017 actions were adverse...............................................................................29

II.    The district court erred when it found Doe failed to raise a prima facie case of Title VII retaliation. ..........................................36

A.    BPD's release of Doe's disciplinary record to hiring agencies was materially adverse because it was designed to interfere with her prospects for employment. ..............................................38

1.    BPD compiled and fabricated the disciplinary record against Doe to punish her for reporting the rape....................................39

2.    BPD released the false disciplinary record to prospective employers and the *Washington Post*. ..............................................44

B.    BPD compiled and released the false disciplinary record because Doe reported the rape, criticized the investigation, and sought to hold BPD accountable. ....................................................48

1.    BPD's adverse release of Doe's disciplinary record is temporally proximate with Doe's efforts to hold BPD accountable....................................................................................49

2.    BPD's labeling Doe "bizarre" and disciplining her for continuing to report the rape indicates a retaliatory mindset...... .........................................................................53

III.    The district court erroneously found that BPD's post-2017 targeted and differential release of Doe's record failed to raise a prima facie retaliation claim. .....................................................56

A.    Doe produced relevant evidence that should have been considered by the district court because it could take an admissible form at trial. ..................................................57

B.  Doe raises a prima facie case of Title VII retaliation once all relevant post-2017 facts are considered. ...........................................62

  1.  A reasonable jury could find BPD's targeted and differential release of disciplinary charges to prospective employers and to the *Washington Post* materially adverse........................................62

  2.  Because BPD's adverse actions occurred within a month of Doe's protected conduct and BPD treated Doe's records differently, a reasonable jury could find causation...................65

Conclusion...........................................................................................68

Certificate of Compliance .........................................................................

Certificate of Service ..............................................................................

Addendum ............................................................................................

# Table of Authorities

## Cases

*Alexander v. Casino Queen, Inc.*, 739 F.3d 972 (7th Cir. 2014)...........................64

*Anderson v. Brennan*, 254 F. Supp. 3d 253 (D. Mass. 2017), *aff'd*, 911 F.3d 1
(1st Cir. 2018)....................................................................................59, 60

*Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53 (2006) ...............40, 42, 49, 70

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................................64

*Del Toro-Pacheco v. Pereira-Castillo*, 662 F. Supp. 2d 202 (D.P.R. 2009), *aff'd
sub nom. Del Toro Pacheco v. Pereira*, 633 F.3d 57 (1st Cir. 2011)............68, 69

*Doe v. Boston Police Dep't*, No. 1784CV00350 (Mass. Super. Ct. Feb. 2, 2017)
(Access Mass. Ct. Cases Database, Suffolk Cnty. Div.)...............................26

*Doe v. City of Boston*, No. 1684CV01434 (Mass. Super. Ct. Jan. 12, 2017)
(Access Mass. Ct. Cases Database, Suffolk Cnty. Div.)...................28, 29, 30

*Douglas v. J.C. Penney Co.*, 474 F.3d 10 (1st Cir. 2007). .....................................41

*Estate of Rahim v. Doe*, 51 F.4th 402 (1st Cir. 2022)............................................63

*Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785 (8th Cir. 2012).................................64

*Garayalde-Rijos v. Mun. of Carolina*, 747 F.3d 15 (1st Cir. 2014)...........59, 60, 75

*Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481 (7th Cir. 2015)...71, 72, 75, 76

*Hannon v. Beard*, 645 F.3d 45 (1st Cir. 2011) ...................................................64, 65

*Hernandez-Torrez v. Intercontinental Trading, Inc.*, 158 F.3d 43 (1st Cir. 1998) ....................................................................................................42

*Johnson v. Mahoney*, 424 F.3d 83 (1st Cir. 2005) ...................................................27

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (2d Cir. 2005) .............. passim

*Lyons v. England*, 307 F.3d 1092 (9th Cir. 2002)............................................32, 35

*Malone v. Lockheed Martin Corp.*, 610 F.3d 16 (1st Cir. 2010).................. passim

*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973)..............................40, 76

*Migra v. Warren Sch. Dist. Bd. of Educ.*, 465 U.S. 75 (1984)...............................27

*Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429 (1st Cir. 1997)..............37

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)...................... passim

*Ortiz v. Federal Bureau of Prisons*, 290 F. Supp. 3d 96 (D. Mass. 2017) ..........54

*Rae v. Woburn Pub. Schs.*, 113 F.4th 86 (1st Cir. 2024) ...................24, 32, 33, 34

*Ray v. Ropes & Gray LLP*, 799 F.3d 99 (1st Cir. 2015).......................................41

*Ray v. Ropes & Gray LLP*, 961 F. Supp. 2d 344 (D. Mass. 2013)...........50, 51, 71

*Rojas v. GMD Airlines Servs., Inc.*, 254 F. Supp. 3d 281 (D.P.R. 2015) ............56

*Sanchez-Rodriguez v. AT & T Mobility Puerto Rico, Inc.*, 673 F.3d 1 (1st Cir. 2012).....................................................................................................55, 74

*Sohnen v. Charter Commc'ns, Inc.*, No. 18-CV-6744, 2025 WL 25418 (E.D.N.Y. Jan. 3, 2025) .........................................................................................38

*Theidon v. Harvard Univ.*, 948 F.3d 477 (1st Cir. 2020).......................................20

*Thurston v. Henderson*, 230 F.3d 1347 (1st Cir. 2000) (unpublished) ........36, 37

*United States v. Fuentes-Lopez*, 994 F.3d 66 (1st Cir. 2021)..........................68, 69

*Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ..............................54

*Wade v. Brady*, 460 F. Supp. 2d 226 (D. Mass. 2006) ..........................................28

## Statutes

28 U.S.C. § 1291 .....................................................................................................1

28 U.S.C. § 1331 .....................................................................................................1

28 U.S.C. § 1367(a) .................................................................................................1

42 U.S.C. § 2000e-3(a) .......................................................................................1, 36

## Rules

Fed. R. Civ. P. 56 .........................................................................................63, 64, 65

Fed. R. Evid. 601 ...................................................................................................66

Fed. R. Evid. 602 ...................................................................................66

Fed. R. Evid. 803(8)................................................................63, 68, 69

**Administrative Materials**

EEOC Compl. Man. § 8–II(D)(2)..........................................................44

**Restatements**

Restatement (Second) of Judgments (Am. L. Inst. 1982).....................26, 27, 28

## Reasons Why Oral Argument Should Be Heard

Plaintiff-Appellant requests oral argument and believes it would aid this Court. This appeal presents important questions about the use of claim-precluded evidence to prove Title VII retaliation, and oral argument would allow this Court to explore these issues with counsel.

## Jurisdiction

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). On January 13, 2025, the district court granted summary judgment to Defendants, disposing of all claims. Addendum (Add.) 1–15. On February 7, 2025, Plaintiff timely filed a notice of appeal. 6 Joint Appendix (JA-6) 2541. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

Under Title VII of the Civil Rights Act of 1964, employers may not retaliate against employees that attempt to enforce the Act's antidiscrimination objectives through protected conduct. 42 U.S.C. § 2000e-3(a). On appeal from the district court's grant of summary judgment to Defendants, the issues presented are whether:

(i)      claim-precluded evidence of an employer's history of retaliation should be considered as relevant background evidence for a plaintiff's actionable Title VII retaliation claim where the plaintiff has never actually litigated the retaliation issue;

(ii)    a reasonable jury could find that an employer's release of an employee's false disciplinary record to prospective employers raises a prima facie case of retaliation where the employer fabricated the record against the employee because she reported she had been raped by a coworker; and

(iii)    hearsay evidence that could take an admissible form at trial showing that an employer targeted a former employee should be considered at summary judgment.

## Statement of the Case

Plaintiff Jane Doe brings this appeal to correct legal errors made by the district court that prevent her from recovering for her former employer's retaliation under Title VII. While employed by the Boston Police Department ("BPD"), Doe was raped multiple times by a fellow officer. Add. 2. She reported the assaults, then BPD placed Doe on administrative leave, brought sixty-five false charges against her, and sent her disciplinary record containing the false charges to her prospective

employers. *See* Add. 2–3. BPD's continued retaliation against Doe hinders her from achieving her goal of working in law enforcement. JA-1 44–45.

The district court made three legal errors. First, the district court failed to consider legally relevant pre-2017 evidence to determine whether Defendants' post-2017 actions violated Title VII. Second, the district court erred when it found that Doe failed to raise a prima facie retaliation claim because it refused to consider the pre-2017 evidence. Third, the district court erred when it found that Doe failed to raise a prima facie case of retaliation based solely on post-2017 evidence.

## I.    Factual Background

### A.    Doe excelled at BPD before she was raped by a fellow officer.

Doe is a former police officer of BPD. JA-1 43. She was one of a "few women of Asian descent" within BPD and experienced BPD's "pervasive culture of sexism." JA-1 30. While she was training to be an officer, her instructors told her to make sure her hair and breasts did not distract the male trainees. JA-1 30. She was told that she must be "either a bitch or a

3

lesbian" to work as a female officer and to "be careful" around her male colleagues. JA-1 30.

Still, Doe worked hard and was successful at BPD. JA-1 30, 184, 187. In September 2009, she was promoted to the Mobile Operations Patrol ("MOP"), a competitive, specialized unit of motorcycle officers within BPD's Special Operations Division. Add. 2. She was the first Asian American woman promoted to the Special Operations Division. JA-1 25. An officer typically must serve three years in the police force before joining MOP, but this prerequisite was waived in Doe's case given her talent and "excellent" interview. JA-3 992–93, 955. Doe's former supervisor described her as "[h]ard-working, competent, self-assured, a go-getter, [and] ambitious." JA-4 1438.

## B.     After Doe reported the rape, BPD placed her on administrative leave, indefinitely confiscated her firearms, and never reinstated her to full duty.

In August 2009, while attending an out-of-state firearms competition with fellow officers, Officer Michael Spence raped Doe three times. JA-3 929; JA-5 2340. After returning to Boston, Spence continued to rape her on

multiple occasions and threatened to shoot her husband if she did not keep the assaults secret. JA-3 912–13; JA-5 2203. Spence was a sniper on the SWAT team, and Doe took his threats seriously. JA-3 913. Spence's truck was spotted on her street, parked directly in front of her home, on multiple occasions. *See* JA-3 1023–24.

On or about September 24, 2009, Doe reported the rape to BPD. Add. 2. The same day, BPD ordered both her and Spence to surrender their private and duty firearms and placed them on paid administrative leave. Add. 2. BPD did not notify Doe of the nature of her paid-leave status nor create any paperwork regarding her leave. JA-3 914. By November, BPD declared Spence fit to return to full duty. Add. 2. Doe remained on paid administrative leave for over three months. Add. 2. All of Spence's personal firearms, except one, were returned to him, even though BPD found that he owned a rifle that he was not legally permitted to have. JA-3 915. Doe's personal firearms, however, remain in BPD's possession. JA-1 31.

On November, 11, 2009, the same month that Spence was reinstated to full duty, Captain-Detective Mark Hayes submitted a report to Deputy

5

Superintendent Genevieve King, detailing concerns about Doe's conduct. JA-2 564. Hayes urged the BPD Internal Affairs Division ("IAD") to investigate Doe's conduct and to "consider Officer [Doe's] psychological fitness for duty and whether or not she can remain a Boston Police Officer." JA-2 566. Throughout his report, Hayes repeatedly characterized Doe's behavior as "bizarre" or "crazy." JA-2 564–65.

Hayes based these conclusions on Doe attending another officer's retirement party, an unnamed neighbor having a negative opinion of Doe and her husband, and Doe testifying under oath about obtaining a restraining order against the rapist. *See* JA-2 564–66. The memo further recommends that Doe be charged with violating a rule against "[w]ithholding [e]vidence" because she "falsely accus[ed] someone of rape." JA-2 566.

In January 2010, Doe was removed from paid leave and forced to use her sick and accrued time. Add. 2. The only explanation that BPD provided was that Doe failed to enroll in a counseling treatment program after being told to do so by BPD's psychiatrist, Dr. Marcia Scott—a conversation that

Doe denies happened. JA-4 1709–10. During Doe's sessions, Dr. Scott repeatedly pressed Doe to share the details of her assaults, even after Doe explained that she had been ordered not to do so. JA-3 916. Dr. Scott also repeatedly refused to answer Doe's questions about what was required for her to be reinstated to full duty. JA-3 900. Finally, in April 2010, Doe ran out of her accrued sick time and was placed on unpaid leave. JA-3 919–20. She was not placed back on BPD's payroll until June, when she was ultimately assigned to light duty. Add 3.

### C.    BPD refused to reinstate Doe despite two psychiatrists and one psychologist confirming her fitness for full duty.

In June 2010, Dr. James Beck, a psychiatrist hired by the police union, declared Officer Doe "fit for duty," finding "no evidence . . . that might impair her ability to function as a Boston police officer." JA-3 889. Referencing a letter written by Dr. Scott discussing Doe's mental state, Dr. Beck said, "it is almost as though we interviewed two different people." JA-3 889.

Next, in September 2010, Doe's psychologist Dr. Suzanne Moon repeatedly informed BPD that Doe did not need to attend weekly therapy

7

sessions and that there were no impediments to her returning to full duty. *See* JA-3 876, 895. Dr. Moon told BPD that the approach they were taking with Doe was setting her up for failure. JA-3 900.

Finally, Dr. Thomas Gutheil, a psychiatrist hired by BPD, concluded in an August 2011 report that "there are . . . no substantive psychiatric disorders that are inconsistent with" Doe's return to full duty as an armed officer. JA-3 895. After reading the Hayes memo, Dr. Gutheil concluded that

> [I]t is difficult to avoid the impression formed from reading the database (in this and other cases) as a whole that *command may have an institutionalized response pattern of labeling as "bizarre" the acts of female officers*, the motives for which they do not understand (and do not inquire).

JA-3 895 (emphasis added). Dr. Gutheil noted that there were obvious "reasonable alternative explanations" for Doe's behavior that the Hayes memo labeled "bizarre." JA-3 896. In response to Dr. Gutheil's report, BPD's counsel insisted that he "not perform any additional work on this matter" and admonished him for his statements about BPD's institutional problem regarding women, reasoning they were "not relevant." JA-3 898.

8

### D.    When Doe continued to criticize BPD's handling of the rape investigation, BPD initiated a disciplinary investigation against her.

On May 29, 2012, Doe submitted a complaint to BPD Police Commissioner Edward Davis alleging bias, conspiracy, untruthful statements, and misconduct by senior BPD officials responsible for investigating the rape. *See* JA-2 576–87. Doe submitted a 21-page formal complaint to the Anti-Corruption Unit ("ACU") on June 29, 2012. JA-3 852. Then-Sergeant Detective Phillip Owens of ACU began an investigation of Doe's complaint which he closed on October 8, 2012. JA-2 576.

One week later, Owens filed an IAD complaint against Doe rather than filing charges against any of the officials Doe reported. *See* JA-6 2515–17, 2519; Add. 3. IAD issued a report recommending that sixty-five BPD rule violations be sustained against Doe. *See* JA-2 324–33. Captain Timothy Connelly, who oversees the IAD and has worked on over seventy-five internal complaint cases, stated that he could not recall a single other case including over ten charges of rule violations. JA-2 719. Sergeant Detective Richard Lewis, who conducted the investigation of Doe, testified that "a

9

big basis" of the charges against Doe was that she "continue[d] to make baseless allegations." *See* JA-2 653.

Of the sixty-five charges against Doe, eighteen are based on Doe making "false accusations" or "misus[ing] the complaint process" during the investigation of her report of rape. JA-2 324–25. Twenty are based on BPD's claims that Doe was untruthful or made "conflicting statements" during the rape investigation. JA-2 332. Seven are based on Doe having criticized BPD's investigation of the rape, including by alleging that there had been a "cover-up." JA-2 326. Seven are based on BPD's claims that Doe misinterpreted BPD's rules or applicable laws, such as for misinterpreting a rape shield law when Doe did not reveal the identity of another rape victim. *See* JA-2 327–29. Two are conclusory statements that do not cite to any specific misconduct by Doe. *See, e.g.*, JA-2 326 ("[Doe] repeatedly exhibited an inability to exercise good judgment."). Seven are otherwise based on Doe's conduct during the rape investigation, including alleged

10

refusal to provide BPD with information *See, e.g.*, JA-2 333 ("Doe failed to cooperate during an interview . . . by failing to answer questions.").[1]

These charges were sustained against Doe even though no determination was ever made about the truth or falsity of Doe's rape allegations. *See* JA-5 2460–62. By July 2013, all levels of BPD's chain of command had approved the IAD's determination that all sixty-five charges be sustained. *See* Add. 3–4.

BPD recommended that Doe be terminated, and Doe appealed. Add. 4. However, while the appeal was pending, Doe resigned effective May 2014. Add. 4. Doe resigned because "of the retaliation that [she] was experiencing [and] that [her] family was suffering from." *See* JA-1 252. As Doe testified, "the police department just went way too far, where they called my having been raped as my opinion, charging me with a rule violation of statement of opinion." JA-1 252. Her resignation was "accepted

---

[1] The remaining four charges are based on Doe's alleged communication with a convicted felon, her failure to report a restraining order against her husband, and Doe's investigation of "an alleged sexual assault" in which she interviewed "individuals potentially involved . . . instead of referring the matter to the Sexual Assault Unit." *See* JA-2 327–28, 333 (charges XVIII, XXVII, LXI, and LXIII).

11

with charges pending" by the Police Commissioner. JA-1 190. Both Doe and BPD understood her resignation to be "with charges pending." JA-2 338; *see* JA-1 248.

### E. Following Doe's resignation, BPD sent the disciplinary record based on Doe's reports to prospective employers and recommended the *Washington Post* "attempt to put [her] in an article."

When Doe tried to obtain employment as a law enforcement officer after resigning, BPD released negative information about her to prospective employers and to the *Washington Post*. *See* JA-1 253–55; JA-2 550. Doe applied to 111 law enforcement jobs from 2010 to 2020, including over forty jobs since February 2, 2017. JA-2 382–408.

To be eligible for these jobs, Doe must typically execute authorizations permitting her former employers to release employment information to prospective employers. JA-2 544–48. Requests for former employee information fall within BPD's HR department, which is housed within the Bureau of Administration and Technology ("BAT"). JA-1 78. The head of BAT, Superintendent Robert Ciccolo, testified that BPD does not have written rules or procedures as to how the department provides

12

information to a requesting agency. *See* JA-2 730; 733. Owens, BPD's 30(b)(6) witness, testified that BPD rules do not require the release of former employee information even if they receive a valid authorization. *See* JA-2 813-14.

However, Ciccolo testified that BPD's informal practice was to distinguish between when *personnel* records should be sent and when *disciplinary* records should be sent. JA-2 742. The default rule was that only the personnel records held by HR should be sent, unless the disciplinary file was specifically requested by a hiring agency. *See* JA-2 745–47. Ciccolo further testified that he could not remember being involved in a background check request in which BPD forwarded the disciplinary file to a prospective employer. JA-2 747.

Yet, when law enforcement agencies asked BPD to send Doe's records, BPD chose to send her *disciplinary* file housed within IAD rather than just her HR *personnel* file. Add. 5, 13. Doe was then rejected from at least ten jobs due to issues with her background check. *See e.g.*, JA-2 384 (North Shore Community College Campus Police Department), 393 (Las

Vegas Metropolitan Police Department), 394 (City and County of Honolulu Police), 396 (Mesa Police Department), 396 (Redmond Police Department), 398 (Washington County Sheriff's Office), 400 (Department of Homeland Security, Immigrations and Customs Enforcement), 402 (Salem Police Department), 403 (Gresham Police Department), 404 (Portland Police Bureau).

For example, when Doe applied to be a police lieutenant for the North Shore Community College Campus Police Department ("NSCCCPD") in August 2019, her conditional offer was rescinded after BPD sent NSCCCPD Doe's disciplinary record. JA-2 384. When Doe applied to be a patrol deputy for the Washington County Sheriff's Office, she was rejected in March 2016 based on her background investigation. JA-2 398–99. When Doe applied to be a police officer in the Redmond Police Department, she was rejected in June 2017 because the "City of Boston refused to cooperate in Redmond's background investigation and would not disclose needed information." JA-2 396.

In addition to sending Doe's disciplinary record to prospective employers, BPD directed background investigators to all of Doe's IAD files, including sensitive, personal information. *See* JA-2 345 JA-6 2532. After Doe had received a tentative employment offer from the Department of Homeland Security ("DHS") in January 2017, BPD allowed a DHS investigator to review and take notes on "the massive amount of information" contained in Doe's internal disciplinary file. JA-6 2534. When DHS attempted to interview Doe's former supervisors, BPD provided no references for the investigator to contact. JA-6 2536. DHS then rescinded its offer of employment. JA-6 2536.

By May 2017, BPD had changed Doe's resignation status from resigned "with charges pending" to resigned "in lieu of termination" when it communicated with outside parties. *See* JA-2 352; JA-2 550–52. First, after Doe's application to be a police officer with the Las Vegas Metropolitan Police Department ("LVMPD") was rejected, LVMPD informed her over email that she was rejected because of records provided by BPD, which included that she resigned "in lieu of termination." JA-2 393–94; *see* JA-2

15

352. BPD also informed LVMPD that Doe had "pending litigation" against them. JA-2 393–94. Second, in July 2017, BPD produced a list of "[t]he names of police officers who since Jan. 1, 2014 to the present have been separated from the department in lieu of termination, discipline, penalty, or proposed termination" and included Doe's name on that list. JA-2 552. In December 2017, BPD told the *Washington Post* that Doe resigned with a pending charge for untruthfulness and that the charge was sustained. JA-2 558. BPD provided Doe's name on a list of thirty officers who had resigned in lieu of termination and highlighted Doe as someone "to attempt to put in an article." JA-2 552, 558; JA-1 274.

Lewis, the BPD official that investigated Doe, acknowledged that the disciplinary charges were largely based on Doe's report of rape. JA-2 653. BPD has since continued to forward the disciplinary file to her prospective employers, hindering her from pursuing her goal of working in law enforcement. *See* JA-2 384, 393–94, 396.

16

## II.    Procedural Background

While represented by previous counsel, Doe brought three actions against Defendants in Massachusetts Superior Court between 2012 and 2017. Add. 6–7. None of these suits reached the merits of her claims; instead, each suit was dismissed on procedural grounds due to failures from Doe's prior counsel. *See, e.g.*, JA-1 59 (Judge Talwani explaining that "the [state court] cases have not been litigated on the merits"). The first suit was dismissed in September 2013 because Doe's previous counsel failed to timely respond to Defendants' discovery requests. Add. 6. The second suit was dismissed in January 2017 because Doe's previous counsel failed to serve Defendants within the ninety-day statutory period. Add. 6–7. The third suit was filed on February 2, 2017, and was identical to the previous action. JA-1 46. However, reasoning that the dismissal for failure to serve process was a final judgment on the merits under Massachusetts law, a Massachusetts Superior Court judge dismissed the 2017 suit. Add. 7. Doe appealed the dismissal, but it was denied for want of prosecution. Add. 7.

17

In October 2020, Doe retained present counsel and sued Defendants in federal court. Add. 7. Doe asserted that Defendants unlawfully retaliated against her for reporting the rape, in violation of Title VII and the First Amendment. Add. 7. Doe also asserted a common law claim of intentional infliction of emotional distress. Add. 7. Defendants moved to dismiss for failure to state a claim, arguing Doe's claims were precluded by the Massachusetts Superior Court's dismissal of the 2017 action. *See* JA-1 43.

Defendants' motion to dismiss was "denied insofar as Doe's claims relate to acts alleged to have occurred after February 2, 2017." JA-1 50. Judge Talwani reasoned the district court was "not at liberty to revisit" the state courts' dismissals of Doe's previous claims. JA-1 50. Although Doe's pre-2017 claims were claim precluded by the 2017 state court judgment, Judge Talwani did not find Doe precluded from litigating the *issues* underlying any of the pre-2017 claims. JA-1 50. ("However, insofar as Doe's claims relate to acts allegedly taken *after* February 2, 2017, they are not precluded.").

During discovery, Defendants refused to comply with Plaintiff's discovery requests, arguing that Judge Talwani's order limited Doe from seeking any discovery prior to February 2, 2017. JA-1 58. When Plaintiff moved to compel, a hearing was held in which Judge Talwani stated:

> I think you're misreading my decision or you are overusing my decision to the extent that you say it bars inquiry into the factual matters that precede 2017. That's not what I said, I didn't say all allegations relating to 2017 are barred, I said claims relating, and [Plaintiff's Counsel] is absolutely correct that you can't prove, you know, if you have a retaliation claim and you can't prove when a claim was made that you're being retaliated for, how can you bring your case?

JA-1 60. Doe's case was then transferred to Judge Joun. JA-1 15. On June 14, 2024, Defendants moved for summary judgment, arguing again that Doe could not rely on any pre-2017 evidence. Add. 8. The district court granted summary judgment in favor of the Defendants on all claims. *See* Add. 15.

On the Title VII retaliation claim, the court found Doe failed to show that Defendants had engaged in any adverse employment action. Add. 10–15. The district court dismissed Doe's argument that BPD's continued release of her disciplinary record constitutes an adverse employment action because the information in the record is false and retaliatory. Add. 10.

19

The court acknowledged that BPD's pre-2017 conduct might be "legally relevant to [proving] what later happened—for example, to help prove the intent behind an act committed after [February 2, 2017], or the act's likely effect on someone like [Doe]." Add. 10–11. However, the court did not explain why it would not consider the evidence that the charges against Doe were false and retaliatory for that purpose. *See* Add. 10–15.

## Standard of Review

This Court's "review of the [district court's] grant of summary judgment is *de novo*." *Theidon v. Harvard Univ.*, 948 F.3d 477, 494 (1st Cir. 2020). "Summary judgment is warranted if the record, construed in the light most flattering to the nonmovant, presents 'no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Id.* (citation omitted).

## Summary of Argument

Title VII makes it illegal for employers to take adverse actions against their employees for protected activity. When Doe reported that a fellow officer raped her, rather than discipline the rapist, BPD subjected her to a

20

years-long disciplinary investigation that culminated in charges labeling her untruthful, disrespectful, and lacking in judgment.

BPD labeled her untruthful because she made "false allegations" about the rapist. They labeled her disrespectful because she criticized BPD's investigation. And BPD labeled Doe as lacking in judgment because she "filed a complaint against" the rapist.

When Doe applied to other police departments, BPD sent them the disciplinary file they compiled against her to prevent her from working in law enforcement. BPD called other police departments and lied about what happened. Then BPD sent false information about Doe's record to the *Washington Post* and told a journalist to include her in an article on police brutality.

By ignoring BPD's history of animosity toward Doe, the district court failed to see the full picture. The district court erroneously considered only a small subset of BPD's post-2017 acts—refusing to acknowledge the backdrop of BPD's years-long retaliatory punishment of Doe. But the Supreme Court and this Circuit have explained that Title VII plaintiffs

21

must not be prevented from using time-barred evidence to support actionable retaliation claims. And Doe has never actually litigated the issue of BPD's pre-2017 retaliation.

Even setting aside BPD's history of retaliation toward Doe, BPD's dissemination of the fabricated disciplinary file is materially adverse. At every opportunity, BPD found a way to retaliate against Doe. BPD deviated from standard procedure, treated Doe's disciplinary file differently than other former officers', and provided false information to prospective employers and the *Washington Post*.

The district court refused to consider this evidence because it applied the wrong standard at summary judgment. The court ignored evidence of BPD's interference with Doe's job applications as hearsay even though it could take an admissible form at trial. Because a reasonable jury could find BPD retaliated against Doe for reporting that she was raped and seeking to enforce Title VII's anti-discrimination mandate, the district court's decision must be reversed.

**Argument**

The district court's decision holding that no reasonable jury could find Doe raised a prima facie case of retaliation must be reversed.

First, the district court erred when it refused to consider BPD's history of retaliatory punishment when determining whether BPD's release of Doe's disciplinary file was adverse. Although BPD's pre-2017 retaliation is claim precluded, Doe has never been precluded from litigating the *issue* of BPD's pre-2017 retaliation. Further, the Supreme Court and this Circuit's precedent requires that district courts consider time-barred evidence of retaliation when assessing actionable Title VII claims. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Rae v. Woburn Pub. Schs.*, 113 F.4th 86, 110 (1st Cir. 2024).

Second, because a reasonable jury could find Doe raised a prima facie case of retaliation, the district court's decision must be reversed. BPD punished Doe and compiled a false disciplinary record against her because she reported she had been raped and criticized BPD's investigation of the rape. When Doe was forced to resign and filed suit for discrimination and

23

retaliation, BPD used the false disciplinary file against her by highlighting it to hiring agencies, the *Washington Post*, and otherwise interfering with her prospects for future employment.

Third, even if Doe could not rely on pre-2017 evidence, BPD's differential treatment of Doe's disciplinary record and targeting Doe for inclusion in a *Washington Post* article constitutes Title VII retaliation because these adverse acts would deter a reasonable employee from engaging in protected conduct.

## I.    The district court erred because it barred Doe from using pre-2017 evidence even though that evidence was not issue precluded and was legally relevant to her actionable claims.

### A.    The district court improperly barred Doe from litigating the issue of BPD's pre-2017 retaliation.

No court has ruled[2] that Doe is issue precluded from arguing that BPD's pre-2017 disciplinary investigation was originally conducted in

---

[2] In fact, the district court *did* rule that Doe was permitted to prove her post-2017 claims using pre-2017 evidence. *See* JA-1 50. That ruling, issued by Judge Talwani in her order denying Defendants' motion to dismiss in part, stated that "insofar as Doe's claims relate to acts allegedly taken after February 2, 2017, they are not precluded." *Id.* At a later hearing, Judge Talwani clarified that ruling when objecting to Defendants'

retaliation. *See* JA-1 49–50 (holding Doe's pre-2017 claims barred by preclusion under the heading "Claim Preclusion"); Add. 10–11; *Doe v. Boston Police Dep't*, No. 1784CV00350, at *1–2 (Mass. Super. Ct. Feb. 2, 2017) (Access Mass. Ct. Cases Database, Suffolk Cnty. Div.). Although Doe cannot recover for that retaliatory conduct due to *claim* preclusion, she *can* recover for BPD's post-2017 and continued release of the disciplinary record that was created. That record has harmed and will continue to harm Doe by hindering her ability to secure future employment, thereby violating Title VII.

The district court erred when it stated it was "not at liberty to revisit any allegedly retaliatory acts that took place prior to . . . February 2, 2017." Add. 10. Despite Doe's arguments at summary judgment and the Court's previous claim preclusion ruling, the district court's summary judgment

---

mischaracterization: "[i]t sounds like you're saying any fact that occurred before 2017 can't be turned over, any document that occurred before 2017 can't be turned over, and that can't be." *See* JA-1 61. Appellant continues to contest the court's statement that "the Court has never ruled directly on Doe's entitlement to post-2017 recovery based on BPD's pre-2017 acts." Add. 11. The district court mischaracterized Judge Talwani's statements insofar as it failed to consider her ruling to be a ruling. Therefore, the Court could not have properly applied the law of the case doctrine.

decision did not address issue preclusion—or claim preclusion—directly. Add. 11. (referring to Doe's precluded claims as "time-barred"). To the extent that the court did address prior holdings on preclusion, it conflated Judge Talwani's claim preclusion holding with issue preclusion.

"[A] federal court must give state-court judgments the same preclusive effect as would be given to that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). In Massachusetts, issue preclusion applies when an issue of fact or law is (1) actually litigated, (2) determined by a valid and final judgment, and (3) the determination is essential to the judgment. *Johnson v. Mahoney*, 424 F.3d 83, 93 (1st Cir. 2005) (explaining that Massachusetts courts follow the Restatement (Second) of Judgments (Am. L. Inst. 1982)).

The state court dismissal here—although based on "form, not substance"—is a valid and final judgment under Massachusetts law. JA-1 49–50. However, whether BPD's disciplinary investigation was retaliatory

toward Doe was not actually litigated and was not essential to the state court's dismissal based on late service of her complaint.

### 1.    Doe never actually litigated the issue of BPD's retaliation.

Under Massachusetts law, an issue is not "actually litigated" unless it "has been properly raised, submitted for determination, and necessarily determined by the earlier decision." *Wade v. Brady*, 460 F. Supp. 2d 226, 240 (D. Mass. 2006). For example, "[i]n the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated." Restatement (Second) of Judgments § 27 cmt. e (Am. L. Inst. 1982).

Here, the issue of BPD's retaliation was not properly raised, submitted for determination, or necessarily determined by the state court's decision. *Doe v. City of Boston*, No. 1684CV01434, at *1–3 (Mass. Super. Ct. Jan. 12, 2017) (Access Mass. Ct. Cases Database, Suffolk Cnty. Div.). The only issue determined by the state court in its January 2017 decision was the issue of previous counsel's failure to serve Doe's complaint. *Id.* There, the issue raised, submitted for determination, and necessarily determined was whether Doe's complaint should be dismissed due to late service. *Id.*

The dismissal for late service in this case also fits neatly into the Restatement's example of a case in which an issue was not actually litigated—a judgment entered by default. Thus, the issue of whether BPD retaliated against Doe was never actually litigated.

### 2. Whether BPD retaliated against Doe was not essential to the state court's judgment that her complaint should be dismissed due to late service.

A determination is only essential if a judgment is "dependent" on it. Restatement (Second) of Judgments § 27 cmt. h. In contrast, determinations with "the characteristics of dicta" are not essential. *Id.* Moreover, "the interest in providing an opportunity for considered determination . . . outweighs the interest in avoiding the burden of relitigation." *Id.*

Here, whether BPD retaliated against Doe was not essential to the state court's dismissal based on late service. That decision depended on whether Doe's service was late—not whether Doe plausibly claimed retaliation. In fact, the Massachusetts Superior Court's decision nowhere analyzes nor mentions the issue of BPD's retaliation. *See Doe*, No. 1684CV01434, at *1–3. Because the state court procedural dismissals here

28

do not preclude Doe from litigating the issue of BPD's retaliation, the district court erred when it refused to consider evidence that the disciplinary record released by BPD was originally compiled in retaliation.

## B.    The district court refused to consider how pre-2017 evidence of retaliation and animus proves BPD's post-2017 actions were adverse.

The district court erred when it failed to consider pre-2017 evidence of BPD's retaliation against Doe as relevant background evidence for her post-2017 claims. The Supreme Court has instructed that Title VII's limitations period must not "bar an employee from using the prior [time-barred] acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. Since *Morgan*, it has been well-settled law in this Circuit that "evidence of events that fall outside [Title VII's] statute of limitations may still be admitted as relevant background evidence to show that discriminatory animus motivated the acts that occurred within the statute of limitations." *Malone v. Lockheed Martin Corp.*, 610 F.3d 16, 22 (1st Cir. 2010); *see Rae*, 113 F.4th at 110.

29

Even where plaintiffs are barred from recovering for acts occurring before a certain date, district courts must consider those acts as background evidence in determining whether later acts were retaliatory. *See Malone*, 610 F.3d at 22. A district court's refusal to consider background evidence in assessing an actionable retaliation claim is thus legal error. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005); *Lyons v. England*, 307 F.3d 1092, 1101, 1111–12 (9th Cir. 2002).

In *Morgan*, the Court addressed when an unlawful employment practice has "occurred" under Title VII. *See* 536 U.S. at 110–11. The Court made clear that "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114; *Rae*, 113 F.4th at 103. Time-barred acts are no longer recoverable even when "related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. However, the Court reasoned that employees could still "fil[e] charges about related discrete acts so long as the acts are independently discriminatory." *Id.* To prove discrete acts are discriminatory, Title VII does

not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Id.*

Recently, in *Rae*, this Court applied *Morgan* to a plaintiff's Title VII claim and re-affirmed the principle that courts should consider time-barred actions as relevant background evidence. 113 F.4th at 110. Rae claimed her employer retaliated against her for advocating on behalf of her students with disabilities. *Id.* at 94. The *Rae* court reasoned that her complaint properly relied on time-barred acts to prove timely acts were undertaken with retaliatory motives. *Id.* at 109–10. Rae's retaliation claim ultimately failed because her employer's actions were not sufficiently severe or pervasive to satisfy the hostile work environment standard on which it was based. *Id.* at 109. Still, this Circuit made clear that "evidence of events that fall outside the statute of limitations may still be admitted as relevant background evidence to show that discriminatory animus motivated the acts that occurred within the statute of limitations"—including for plaintiffs not "rely[ing] on the continuing violations doctrine." *Id.* at 110 (internal quotation marks omitted).

31

Although this Circuit has not had occasion to reverse a district court for failure to consider relevant background evidence, other Circuits applying *Morgan* have. *See Jute*, 420 F.3d at 177; *Lyons*, 307 F.3d at 1101, 1111–12. Both the Second and Ninth Circuits reversed a district court's finding of summary judgment in favor of employers based on a failure to consider how time-barred background evidence might support retaliatory intent in later timely claims. *Jute*, 420 F.3d at 177; *Lyons*, 307 F.3d at 1101, 1111–12. The First Circuit has also consistently affirmed the Supreme Court's instruction that plaintiffs should not be prevented from using evidence of unrecoverable adverse actions in support of actionable claims. *See, e.g., Malone*, 610 F.3d at 22 ("[E]vidence of events that fall outside the statute of limitations may still be admitted as relevant background evidence to show that discriminatory animus motivated the acts that occurred within the statute of limitations."); *Rathbun*, 361 F.3d at 76 ("[T]he fact that an event itself is not actionable does not automatically negate its evidentiary value. A discriminatory act or practice that is not the basis for a timely charge of discrimination may constitute relevant background

32

evidence in a proceeding in which the same type of discriminatory act or practice has been timely challenged.").

Here, the district court refused to consider pre-2017 evidence that Doe's disciplinary record was false and compiled by BPD in retaliation for her protected conduct. *See* Add. 10-11. The district court acknowledged that time-barred evidence may be relevant to prove the retaliatory intent of later acts, but it failed to explain why it did not consider such evidence in Doe's case. *See* Add. 11. Instead, the court stated it was "not at liberty to revisit" any of the relevant background evidence showing animus and differential treatment because it cannot be "used as a substitute for proof of actual retaliation." Add. 10 (citing *Thurston v. Henderson*, 230 F.3d 1347, 1 (1st Cir. 2000) (unpublished)).

The caselaw relied upon by the district court for that conclusion predates the Supreme Court's decision in *Morgan*. Add. 10–11 (citing *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 439 (1st Cir. 1997); *Thurston*, 230 F.3d at 1). But *Morgan* provides the relevant guidance here— that plaintiffs must be permitted to use time-barred background evidence

to support timely Title VII claims. *See* 536 U.S. at 113. Although Defendants cited *Rae* as "eerily like this [case]" at the hearing on their Motion for Summary Judgment, the district court did not explain why *Rae* or any of this Circuit's other post-*Morgan* caselaw did not apply. *Compare* JA-6 2566 *with* Add. 10–11. In fact, the district court did not cite *Morgan* or *Rae* in its decision at all. *See* Add. 10-11. The district court therefore erred when it failed to apply the rule from *Morgan* and *Rae*.

Once post-*Morgan* law is properly applied here, Doe's claim-precluded background evidence must be considered for whether it supports her actionable claims. A contrary rule would prevent plaintiffs like Doe from holding wrongdoing employers accountable for continuing retaliation simply because the acts showing that employer's discriminatory intent are no longer recoverable.

The principle that time-barred background evidence may be used to prove the intent behind timely claims applies with equal force to partially claim-precluded retaliation. *See also Sohnen v. Charter Commc'ns, Inc.,* No. 18-CV-6744, 2025 WL 25418, at *9 (E.D.N.Y. Jan. 3, 2025) (reasoning that it

34

would improperly "hamstring the plaintiff's case" to prevent evidence of a previously dismissed harassment claim that supported a presently viable retaliation claim). Like a plaintiff whose claim is partially time-barred due to a statute of limitations, a plaintiff whose claims are partially precluded must be permitted to use all legally relevant background evidence to prove actionable claims. Here too, Doe should not forever be prevented from pursuing justice for BPD's retaliatory file on account of previous counsel's mistakes, especially when the underlying nature of her claim—BPD's retaliation against her prior to 2017—was never actually litigated.

Moreover, the court's refusal to allow Doe to use pre-2017 evidence to prove BPD's actions were adverse only produces a more confused result. The district court and Defendants have effectively considered pre-2017 evidence in finding and conceding that Doe engaged in protected conduct. Add. 10. The district court did not clarify which instance of protected conduct by Doe formed the basis of its finding. Add. 10. However, Doe engaged in protected conduct when she filed charges of discrimination with the Massachusetts Commission Against Discrimination in 2010; when

35

she sued in state court in 2012, 2016, and 2017; and when she reported the rape in 2009. Add. 2, 6–7. The district court thus refused in error to consider relevant background evidence on one element of Doe's claim while implicitly considering such evidence on another element.

Because the district court's decision failed to apply the Supreme Court's reasoning in *Morgan* or this Circuit's holding in cases like *Rae*— frustrating Title VII's anti-discrimination purpose—it must be reversed.

## II.  The district court erred when it found Doe failed to raise a prima facie case of Title VII retaliation.

The "basic objective" of Title VII is "equality of employment opportunities." *Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53, 63 (2006) (quoting *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973)). To effectuate that purpose, the anti-retaliation provision, 42 U.S.C. § 2000e-3(a), aims to prevent employers from harming employees that attempt "to secure or advance enforcement of the Act's basic guarantees." *White*, 548 U.S. at 63.

"[T]he burden for establishing a prima facie [Title VII] case is not onerous." *Douglas v. J.C. Penney Co.*, 474 F.3d 10, 14 (1st Cir. 2007). To make

36

out a prima facie case of retaliation, plaintiffs must show that (1) the employee engaged in protected conduct under Title VII, (2) the employee suffered an adverse employment action, and (3) the adverse action was causally connected to the protected activity. *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 107 (1st Cir. 2015).

The district court correctly accepted Defendants' concession that Doe engaged in protected conduct under Title VII. Add. 10. However, the district court erred when it refused to consider other claim-precluded evidence showing retaliatory intent in BPD's post-2017 actions. The district court then based its holding that BPD engaged in no adverse action on that legal error. Because (A) BPD's targeted release of a retaliatory disciplinary record to Doe's prospective employers is materially adverse, and (B) that adverse action is causally connected to Doe's report of having been raped and filing of Title VII claims and lawsuits, Doe raises a prima facie case of retaliation.

### A. BPD's release of Doe's disciplinary record to hiring agencies was materially adverse because it was designed to interfere with her prospects for employment.

An employer's actions are materially adverse if they could "dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 57. This standard "encompasses a variety of adverse employment actions, including demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Hernandez-Torrez v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998).

BPD's repeated release of false disciplinary charges based on Doe's report of having been raped would dissuade other rape victims from coming forward for fear of similar retaliation. BPD's dissemination of Doe's record—which contained dozens of fabricated charges against Doe for "making false allegations" about having been raped—is thus a materially adverse action.

First, pre-2017 instances of differential treatment and animus show that Doe's disciplinary record was compiled by BPD in retaliation for her

report of having been raped. Second, BPD's post-2017 release of the retaliatory record to dozens of hiring agencies interferes with her prospects for employment and dissuades rape victims from coming forward.

### 1. BPD compiled and fabricated the disciplinary record against Doe to punish her for reporting the rape.

The same day she reported having been raped by another officer, BPD launched a disciplinary investigation which fabricated charges against Doe based on her insistence that the rape occurred and her criticism of BPD's investigation into the rapist. Even if not actionable, evidence of employer retaliation may be used by plaintiffs to prove a timely action was adverse. *See Malone*, 610 F.3d at 19; *Jute*, 420 F.3d at 177. A district court's refusal to consider relevant background evidence in assessing a Title VII retaliation claim is thus grounds for reversal. *See, e.g.*, *Jute*, 420 F.3d at 177.

In *Jute*, the Second Circuit reversed summary judgment where a district court failed to consider time-barred adverse actions by an employer. *Id.* at 168-69. There, the statutory limitations period prevented Jute from recovering for adverse acts occurring before 1999. *Id.* at 176. However,

39

Jute's retaliation claim based on a negative reference provided after 1999 was still recoverable against her employer. *Id.*

Applying the Supreme Court's decision in *Morgan*, the Second Circuit found the district court was wrong to conclude that Jute could not recover for her post-1999 claim. *Id.* at 176, 178–79. Pre-1999 evidence showed that, when Jute was named as a witness in a coworker's Title VII lawsuit, her employer began engaging in adverse actions including demotions and denied promotions. *Id.* at 169. Post-1999, Jute's former supervisor falsely advised an inquiring prospective employer that Jute "had a lawsuit pending" against her former employer. *Id.* at 178. Although the district court found this singular false statement in Jute's reference insufficient to prove retaliation, the Second Circuit disagreed. *Id.* at 178–79. Once the pre-1999 retaliatory conduct was properly considered as background evidence, Jute raised a prima facie case based on her employer's negative, false reference. *Id.*

In *Malone*, both the district court and this Circuit affirmed that time-barred acts were still relevant "to show that discriminatory animus

40

motivated the acts that occurred within the statute of limitations." 610 F.3d at 22. Because Malone's background evidence of discipline was based on his poor attendance rather than on animus, summary judgment was affirmed. *Id.* at 22, 24. However, *Malone* affirmed the principle that where, as here, a plaintiff produces relevant evidence of previous disciplinary action based on protected activity, that evidence should be considered in support of timely retaliation claims. *See id.* at 22.

Like the pre-1999 evidence showing that Jute's demotions were connected to her cooperation in a Title VII suit, pre-2017 evidence shows BPD punished Doe because of her report of having been raped and her criticism of BPD's investigation. First, BPD's disciplinary process punished Doe more strictly than the rapist, Spence, who BPD treated with preference throughout the investigation. The day Doe officially reported her assaults in 2009, BPD immediately placed Spence *and Doe* on administrative leave. JA-3 1254. Yet, unlike Spence, Doe was never given a specific reason for being placed on leave. JA-4 1699-700. Spence was declared fit to return to duty in November—but Doe was not. JA-4 1699–700. Almost all of Spence's

personal firearms were returned to him—but none of Doe's have ever been returned. JA-4 1699–700.

Instead, BPD ordered Doe to meet with a psychiatrist that BPD hand-picked. JA-3 888-90. Doe continued to file complaints that BPD was covering up the rape and that her investigation was biased. BPD responded by investigating Doe herself and failing to give clear directions about what steps Doe needed to take to be reinstated after being declared fit for duty. *See* JA-3 900. Doe's psychologist warned BPD that they were setting Doe up for failure. JA-3 900. Doe's report of having been raped was attacked as inconsistent—even though Spence's version of the story also contained inconsistencies. *See* JA-5 2457–60. Doe's criticism of BPD's investigation of the rape was attacked as disrespectful—yet Spence calling his coworkers slurs was "healthy competition" and not disrespectful. *See* JA-2 606, 639.

Second, BPD's disciplinary investigation resulted in charges that are directly based on Doe's engagement in protected conduct. The sixty-five charges labeled her untruthful, disrespectful, and lacking in judgment. *See* JA-1 320-21. BPD's investigation of Spence ended with zero sustained

42

charges related to his having raped Doe. *See* JA-3 1034. One charge claims

Doe engaged in "Conduct Unbecoming" because she "*continued to make . . .*

*allegations against Police Officer Michael Spence.*" JA-2 325 (emphasis added).

Other charges are based on Doe criticizing the investigation of the rape,

alleging that BPD had "cover[ed] up" these incidents, that investigators

had conflicts of interest, and reporting that BPD leadership had previously

dissuaded rape victims within the department. *See* JA-2 325–31. The very

officer who conducted her disciplinary investigation stated under oath that

"a big basis" of the charges against Doe was that she "continue[d] to make

baseless allegations." *See* JA-2 653. In other words, Doe was punished for

reporting having been raped by another officer.

Evidence that BPD's post-2017 release of her disciplinary file was

based on fabricated charges is thus even greater than the plaintiff's in *Jute*,

who showed her employment reference was retaliatory solely because it

falsely claimed she had a lawsuit pending against her employer. Where

*Jute*'s single instance of false information in her reference was enough to

prove retaliation, Doe's evidence of dozens of false charges being released

43

to prospective employers here too proves material adversity. Doe's evidence is also greater than Jute's in kind—BPD's release of a disciplinary record based on punishing Doe for "making false allegations" after she reported having been raped by a male coworker uniquely implicates sex-based discriminatory intent.

Thus, a reasonable jury could find that BPD's pre-2017 investigation—and the disciplinary record it produced—was retaliatory.

### 2.    BPD released the false disciplinary record to prospective employers and the *Washington Post*.

An employer's action is materially adverse when it would dissuade a reasonable worker from making or supporting a charge of discrimination. *White*, 548 U.S. at 68. The Supreme Court in *White* explained that this standard is still met even if an employee that had been suspended for retaliatory purposes is later reinstated and awarded backpay. *Id.* ("A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former.").

44

Similarly, an employer's post-employment actions which are "designed to interfere with the individual's prospects for employment" are materially adverse because a reasonable employee would be dissuaded from coming forward. *Ray v. Ropes & Gray LLP*, 961 F. Supp. 2d 344, 358–59 (D. Mass. 2013) (quoting EEOC Compl. Man. § 8–II(D)(2)); *see Jute*, 420 F.3d at 177–79.

In *Ray*, an employer that refused to provide their former employee with a positive reference following their EEOC complaint acted adversely. 961 F. Supp. 2d at 359. That employer also provided the EEOC's initial no cause determination letter to the legal media website *Above the Law*. *Id.* at 351, 359. The *Ray* defendant "knowingly releas[ing] severely damaging information about Ray"—including "performance reviews and an internal investigation into alleged criminal conduct on Ray's part"—was sufficient to prove a prima facie claim of retaliation. *Id.* at 359–60.

Similarly, in *Jute*, the time-barred background evidence of an employer's pattern of retaliation proved a Title VII claim based on a single negative reference. 420 F.3d at 177. The Second Circuit reasoned the district

45

court had "required Jute to prove too much when it mandated that she present an affidavit or other sworn testimony . . . attributing [a prospective employer's] non-hire decision to [her employer's false] comment." *Id.* at 179. Instead, Jute and her husband's testimony—against the backdrop of pre-1999 background evidence showing animus—was enough to raise a jury question. *Id.* at 179, 177.

Here, BPD has taken numerous post-employment actions "designed to interfere with [Doe's] prospects for employment." Just as interference with an employee's prospective employment through negative references or refusal to provide recommendations was adverse in *Ray* and *Jute*, so too is BPD's release of a retaliatory disciplinary record to hiring agencies. A reasonable jury could find that Doe was rejected from dozens of jobs due to BPD's release of the disciplinary record they compiled against her. *See, e.g.*, JA-2 400.

For example, Doe applied to be a DHS investigator and was rejected in December 2017 when BPD forwarded her retaliatory disciplinary record. JA-2 400; JA-6 2532–36. When Doe applied to be a patrol deputy for the

46

Washington County Sheriff's Office, she was rejected in March 2016 based on her background investigation. JA-2 398–99. When Doe applied to be a police officer in the Redmond Police Department, she was rejected in June 2017 because the "City of Boston refused to cooperate in Redmond's background investigation and would not disclose needed information." JA-2 396. And Doe was rejected from LVMPD after BPD told them she had "pending litigation" against BPD. JA-2 393–94. As in *Jute*, where an employer's action was adverse because they provided a reference based on a false statement, BPD took adverse actions against Doe when they shared the fabricated disciplinary record and otherwise interfered with Doe's background investigations.

Evidence here also shows differential treatment in BPD's post-2017 handling of Doe's records. Contrary to standard practice, BPD forwarded Doe's disciplinary file to numerous prospective employers. JA-2 745–47. At least ten prospective employers rejected Doe's application because of BPD's interference with her background check, refusal to cooperate, or dissemination of false, retaliatory information. *See, e.g.*, JA-2 384. Like the

47

employer's action in *Ray*—forwarding Ray's personal information and investigation record to *Above the Law*—BPD's release of Doe's disciplinary status to the *Washington Post* is adverse. JA-2 550–55.

Moreover, BPD provided the *Washington Post* with false information—BPD listed Doe's status as "resigned in lieu of termination" even though BPD admitted that there was never any final determination as to whether she would be terminated and that her status should be resigned "with charges pending." *Compare* JA-2 336–38 *with* JA-2 552. BPD's history of retaliatory animus aimed at Doe further shows their later release of her record was intended to be adverse.

### B. BPD compiled and released the false disciplinary record because Doe reported the rape, criticized the investigation, and sought to hold BPD accountable.

A reasonable jury could find that Doe's report of the rape and lawsuits against BPD caused BPD's disciplinary investigation and later release of her record. "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). A causal connection may be demonstrated

48

"in a number of ways, including evidence of 'differential treatment in the workplace . . . temporal proximity of an employee's protected activity to an employer's adverse action . . . [or] comments by the employer which intimate a retaliatory mindset.'" *Ortiz v. Federal Bureau of Prisons*, 290 F. Supp. 3d 96, 107 (D. Mass. 2017).

First, the chain of events triggered by Doe's report of having been raped—beginning with Doe being placed on leave the same day she made her report—is temporally proximate. That chain of events continues after February 2017, as Doe continued to file lawsuits against BPD and BPD continued to retaliate by releasing Doe's fabricated disciplinary record to prospective employers. Second, the history of BPD's animosity toward and persistent differential treatment of Doe intimates a retaliatory mindset.

### 1.   BPD's adverse release of Doe's disciplinary record is temporally proximate with Doe's efforts to hold BPD accountable.

To show causation through temporal proximity, plaintiffs must generally prove the adverse action occurred within three months of the protected conduct. *See Sanchez-Rodriguez v. AT & T Mobility Puerto Rico, Inc.*,

673 F.3d 1, 15 (1st Cir. 2012) (finding "very close" temporal proximity where protected conduct occurred in February and adverse action occurred in May); *Rojas v. GMD Airlines Servs., Inc.*, 254 F. Supp. 3d 281, 302-03 (D.P.R. 2015) (holding that a two-month gap between plaintiff's protected conduct and employer's adverse action was temporally "very close"). Relevant time-barred evidence that "shows a chain of events that arose immediately after" the first instance of protected conduct may also satisfy temporal proximity. *Jute*, 420 F.3d at 177.

In *Jute*, the Second Circuit reversed the district court's finding that Jute failed to demonstrate a causal link between the protected activity and the adverse action. *Id.* at 176. The lower court based its decision on the "'significant lapses of time' between Jute's protected activity in July 1998 and the actionable adverse employment actions, the earliest of which occurred in September 1999." *Id.* The Second Circuit disagreed because the background "facts, although not actionable because they pre-date July 1999, might nonetheless remain admissible at trial and could lead a rational jury

50

to find a causal link between the protected activity and the actionable adverse acts." *Id.* at 177.

BPD's pre-2017 pattern of retaliation—when properly considered as relevant background evidence—similarly "shows a chain of events that arose immediately after" Doe's report of the rape "that might support [Doe's] timely claims." First, Doe reported that she had been raped by a fellow officer in September 2009. Add. 2. Doe was placed on administrative leave the same day. Add. 2. From that day forward, BPD's adverse actions remained closely temporally connected to Doe's engagement in protected conduct. Two months after her report of having been raped, Hayes authored a derisive memo that unfairly labeled Doe as "bizarre," which BPD's own psychiatrist later said was an "institutionalized response pattern" toward female officers. *See* JA-2 563; JA-3 895. Doe continued to make reports that she had been raped, and BPD kept Doe on paid administrative leave until January 2010 when she was required to use her sick and accrued time. Add. 2.

In June 2012, Doe sent a formal complaint to ACU alleging that BPD was engaged in a cover-up of the rape. JA-3 852. Doe supplemented her complaint eleven times between June and August 2012. JA-3 576. On October 8, 2012, Owens completed his IAD complaint against Doe, which led to the sixty-five false charges. JA-3 576-77.

Doe sued BPD in August 2012 and again in May 2016. Add. 6. The same month Doe sued BPD for a second time, she was rejected by the Mesa Police Department based on information discovered in her background investigation. JA-1 248. In September 2017, a DHS ICE investigator stated that attempts to interview Doe's BPD supervisors "were met with negative results" and that zero employment references were completed. JA-2 345; JA-6 2532. Doe sued BPD again in February 2017. Add. 7. That same month, LVMPD informed Doe that she was not eligible to be hired because BPD was not sharing necessary information but *did* share that she had "pending litigation" and that she resigned "in lieu of termination" for "sustained conduct." JA-2 393–94. On March 7, 2017, BPD sent Doe's disciplinary record with false information to the *Washington Post*. Add. 6.

52

The close temporal proximity between Doe's protected conduct and BPD's adverse release of the retaliatory disciplinary record supports a causal nexus.

### 2. BPD's labeling Doe "bizarre" and disciplining her for continuing to report the rape indicates a retaliatory mindset.

"'[T]emporal proximity' is merely one factor relevant to causation." *Garayalde-Rijos v. Mun. of Carolina*, 747 F.3d 15, 25 (1st Cir. 2014); *see Anderson v. Brennan*, 254 F. Supp. 3d 253, 258–59 (D. Mass. 2017), *aff'd*, 911 F.3d 1 (1st Cir. 2018). Even without temporal proximity, causation may be proved through earlier instances of an employer's differential treatment or comments intimating a retaliatory mindset. *Garayalde-Rijos*, 747 F.3d at 25.

In *Anderson*, for example, a six-month gap did not defeat causation where there was time-barred evidence of a "prior history of retaliatory discipline." 254 F. Supp. 3d at 258–59. There, an "inference of retaliation" was "strengthened" by evidence that the plaintiff had been disciplined much more severely than other employees for similar conduct. *Id.* at 259. Similarly, in *Garayalde-Rijos*, the fact that there was a five-month gap between the plaintiff's EEOC complaint and the beginning of the

53

employer's retaliatory harassment did not defeat causation. 747 F.3d at 25. Instead, earlier instances of discrimination in the hiring process in addition to the employer's later differential treatment were sufficient. *Id.*

As in *Anderson* and *Garayalde-Rijos*, evidence that BPD treated Doe differently after she reported having been raped supports causation. Whereas Spence was determined fit for reinstatement within one month of being placed on leave, Doe was subjected to a disciplinary investigation that spanned years. After Doe filed suit alleging discrimination, BPD also treated Doe's employment records differently than other officers'. For example, BPD deviated from standard practice by sending Doe's disciplinary file rather than her personnel file. JA-2 745–47.

Evidence also supports a finding that BPD maintains a retaliatory mindset toward Doe. Doe experienced a pervasive culture of sexism while employed by BPD. She was told she must be a "bitch" or "lesbian" and that she should cover her hair and breasts to avoid distracting male officers. JA-1 30.

54

Doe was not the only person that remarked on BPD's sexist culture. BPD's psychiatrist, Dr. Gutheil, found that "[BPD] command may have an institutionalized response pattern of labeling as 'bizarre' the acts of female officers, the motives for which they do not understand (and do not inquire)." JA-3 895. Dr. Gutheil based that conclusion on his review of "extensive" evidence, including legal documents, internal correspondence between BPD officials, and the Hayes memo. *See* JA-3 894–95; JA-2 564–66. Just as Dr. Gutheil reasoned that BPD was labeling Doe "bizarre" because it had an "institutionalized" problem toward women, so too could a reasonable jury.

BPD continued to have this retaliatory mindset when they brought the dozens of charges that largely stemmed from Doe's report and disseminated these charges in a way that differentiated from their usual treatment of disciplinary records. *See* JA-2 653. A reasonable jury could thus find BPD's release of a fabricated disciplinary file to hiring agencies was motivated by a retaliatory mindset.

55

## III.  The district court erroneously found that BPD's post-2017 targeted and differential release of Doe's record failed to raise a prima facie retaliation claim.

Even accepting the district court's erroneous conclusion that pre-2017 evidence was irrelevant or barred from consideration, there is still a genuine issue of material fact as to whether BPD retaliated against Doe.

The district court's reasoning was flawed because it disregarded post-2017 evidence relevant to Doe's Title VII claim. The court reasoned that "hearsay testimony cannot create a factual dispute to defeat summary judgment." Add. 14. This is wrong for two reasons: (1) at the summary judgment stage, a nonmoving party need only produce evidence that *could* take an admissible form at trial, and (2) evidence the district court refused to consider is admissible under the public records exception. *See* Fed. R. Civ. P. 56; Fed. R. Evid. 803(8). Once this evidence is properly considered, Doe states a prima facie case of retaliation under Title VII even based solely on post-2017 evidence.

### A.    Doe produced relevant evidence that should have been considered by the district court because it could take an admissible form at trial.

"[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form." *Estate of Rahim v. Doe*, 51 F.4th 402, 412 (1st Cir. 2022) (quoting *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011).

At the summary judgment stage, depositions may be given the same weight as declarations and are permissible forms of evidence when they comply with the Rule 56 requirements for affidavits or declarations. Fed. R. Civ. P. 56 advisory committee's note (2010 amendment) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). The requirements for an affidavit, declaration, or, in this case, a deposition, are that they must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify to the matters stated. Fed. R. Civ. P. 56(c)(4).

The district court erred when it relied on *Hannon* for the proposition that "it is black-letter law that hearsay evidence cannot be considered on summary judgment." 645 F.3d at 49. This misses the point. In *Hannon*, the plaintiff failed to show causation because the only evidence offered at summary judgment was a self-serving affidavit and deposition without *any other* support in the record. *Id.* But the First Circuit in *Hannon* did not refuse to consider every form of deposition testimony, stating that "both affidavits and deposition testimony are effective in opposing summary judgment" when they are given on personal knowledge, have facts that would be admissible at trial, and show the declarant is competent. *Id.*

The district court refused to consider relevant evidence stemming from Doe's depositions—even though the facts would be admissible at trial through witness testimony, Doe is a competent witness, and the information was personal knowledge. Add. 10–14. First, the court refused to consider Doe's allegation that BPD provided negative information to NSCCCPD because Doe only supported this claim with deposition testimony. Add. 12; JA-1 254–55. Second, the district court failed to

58

consider Doe's statement in her deposition that BPD had provided false information to the Honolulu Police Department ("HPD"), which negatively affected her application, and that she heard this information directly from the HPD investigator over the phone. Add. 12–13; JA-1 303–04.

These statements are both based on Doe's personal knowledge because she heard the information directly from representatives of NSCCCPD and HPD. *See* Fed. R. Evid. 601, 602. In both instances, the evidence Doe references is admissible at trial through the testimony of third parties. NSCCCPD Lieutenant David Cook and HPD Detective Dale Uemura can testify that BPD's adverse actions interfered with Doe's prospects for employment. All this information was on the record at summary judgment. JA-2 355, 358, 384, 394. The district court should have treated this information not as "speculative, hearsay testimony" but as relevant and proper evidence on summary judgment. Add. 12.

Doe also referenced admissible documentary evidence during her deposition which proves BPD interfered with her background checks. For example, Doe's testimony references an email from LVMPD revealing that

BPD changed Doe's resignation status. Add. 13. The court again ignored relevant, admissible information which should have been considered at the summary judgment stage because the email can be presented at trial, or LVMPD Officer Stacy Short could testify to the contents of this email at trial. JA-2 393–94.

The district court also erred when it refused to consider the DHS Report, labeling it as hearsay without considering its admissibility under any of the many hearsay exceptions. Add. 13–14; JA-6 2521; Fed. R. Evid. 803 (8). For example, the court should have analyzed whether the DHS report is admissible as a public record because it results from an investigation made pursuant to legal authority and has no indications of a lack of trustworthiness. *See* Fed. R. Evid. 803(8); *United States v. Fuentes-Lopez*, 994 F.3d 66, 70 (1st Cir. 2021); *Del Toro-Pacheco v. Pereira-Castillo*, 662 F. Supp. 2d 202, 211 (D.P.R. 2009), *aff'd sub nom. Del Toro Pacheco v. Pereira*, 633 F.3d 57 (1st Cir. 2011).

The court in *Del Toro-Pacheco* found that investigative reports, which included witness interviews, compiled by agents of the Puerto Rico

Department of Corrections and Rehabilitation for the purpose of investigating a sexual assault were admissible under Rule 803(8). 662 F. Supp. 2d at 211–12. The court reasoned that investigative reports prepared in a timely fashion by public officials within the course of their duties plainly satisfy the public records exception. *See id.* at 211–12; Fed. R. Evid. 803(8). In *Fuentes-Lopez,* the First Circuit held that a standard form commonly used by DHS was a public record and that public records are presumptively reliable. 994 F.3d at 71.

The DHS report here was created by a public official in accordance with that official's legal responsibility to perform a background check on Doe before offering her a position. JA-6 2522. The report identifies the date of its creation, a detailed history of the agent's investigation, the identifying information of the investigators, and is signed by both Doe and a witness for the federal agency. JA-6 2522, 2540. Because there are no extraordinary reasons to consider this report untrustworthy, the district court erred when it refused to consider the information contained within the DHS report.

61

**B.    Doe raises a prima facie case of Title VII retaliation once all relevant post-2017 facts are considered.**

Doe states a valid prima facie case under Title VII. First, as conceded, Doe engaged in protected conduct several times. Second, BPD took multiple adverse actions to retaliate against Doe. BPD targeted Doe for ridicule in correspondence with the *Washington Post*. BPD released harmful internal disciplinary records to prospective employers when those records would not have been released for other former employees. BPD refused to provide standard background references to a DHS investigator and other hiring agencies. Lastly, the close temporal proximity and differential nature of these acts satisfy causation.

**1.    A reasonable jury could find BPD's targeted and differential release of disciplinary charges to prospective employers and to the *Washington Post* materially adverse.**

An employer's action is materially adverse if it would dissuade a reasonable worker from making a charge of misconduct. *White*, 548 U.S. at 57. Producing records of prior complaints and producing targeted information to the media, especially when those acts demonstrate differential treatment, are materially adverse because they would dissuade

a reasonable worker from making a protected claim. *See e.g.*, *Ray*, 961 F. Supp. 2d at 344; *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015).

Publicizing a former employee's protected actions and personal information is an adverse action. *See Ray*, 961 F. Supp. 2d at 359–62; *Greengrass*, 776 F.3d at 483. In *Ray*, the employer's refusal to provide a recommendation and the forwarding of the plaintiff complaint to a news outlet were adverse actions. 961 F. Supp. 2d at 359–62. The facts in *Greengrass* are even less severe. *See* 776 F.3d at 483. There, the employee filed an EEOC complaint alleging sex discrimination, national origin discrimination, and retaliation. *Id.* The employer, a public company, included her complaint, her name, and general facts related to the complaint in their SEC filings. *Id.* at 484. Immediately before and after listing plaintiff by her full name, the employer only listed vague details about other complaints in SEC filings, and did not include the complainants' names or details about the allegations. *Id.* at 483–84. The court held that disclosing the plaintiff's name was an adverse action

63

because filing a complaint itself could be viewed negatively by future employers. *Id*. at 485–86.

Even setting aside the fact that the disciplinary record against Doe was false and compiled in retaliation, BPD's targeted release of Doe's record is similarly adverse. In *Greengrass* and *Ray*, an accurate disclosure was enough to satisfy adversity. Here, BPD released Doe's disciplinary record to prospective employers when their standard practice was only to release personnel records. That record included the fact that she made a complaint against BPD which negatively affected her ability to obtain multiple law enforcement positions after 2017. *See e.g.*, JA-2 384.

Additionally, contrary to their standard practice of only releasing personnel records, BPD specifically directed a DHS investigator who was doing a background check of Doe to her disciplinary file. JA-6 2532–33. They exposed the entire file and permitted the investigator to take notes on "the massive amount of information" in the file, which led to Doe's offer being rescinded. JA-6 2534–36; JA-2 345. BPD also singled out Doe from a list of thirty other former officers for inclusion in a *Washington Post* article.

64

JA-1 274, JA-2 552. Further, as a February 2017 email shows, BPD changed Doe's status to "resigned in lieu of termination," which puts an unwarranted negative taint on Doe's resignation as BPD admits that there was no final determination as to whether she would be terminated and that her resignation would be "with charges pending." JA-2 336, 338; JA-1 248. This prevented her from receiving an offer from LVMPD. JA-2 393–94.

A reasonable jury could conclude that these acts indicate BPD designed to interfere with Doe's prospective employment. Because a reasonable rape victim would not report a rape or sue her employer if she knew her employer would single out her disciplinary record to prospective employers, or to a major newspaper like the *Washington Post*, Doe's post-2017 evidence alone satisfies adversity.

> ### 2.    Because BPD's adverse actions occurred within a month of Doe's protected conduct and BPD treated Doe's records differently, a reasonable jury could find causation.

Three months between a protected act and adverse response is generally sufficient to find causation by temporal proximity. *See Sanchez-Rodriguez*, 673 F.3d at 15. Here, Doe sued BPD in February 2017 and that

65

same month, LVMPD informed Doe that she would not be hired based on BPD's release of information. JA-2 426. In March 2017, BPD encouraged the *Washington Post* to feature Doe in an article about officer misconduct. JA-1 274. While Doe's case was in active litigation in September 2017, BPD refused to give Doe employment references for her job with DHS but allowed the investigator to pore over her disciplinary file, contrary to standard practice. *See* JA-6 2532–36. Because BPD's adverse actions are temporally proximate to Doe's protected conduct, causation is satisfied.

Even where temporal proximity is not satisfied, evidence of differential treatment or animosity may prove causation. *See Garayalde-Rijos*, 747 F.3d at 25; *Greengrass*, 776 F.3d at 486. In *Greengrass,* the employer had an inconsistent policy as to whether the full name of a complainant would be disclosed in SEC filings. 776 F.3d at 487. The court concluded that "multiple shifts in policy" could lead a juror to find that the employer treated Greengrass differently from others, and "even if evidence presented by [the plaintiff] does not compel the conclusion that [her employer] discriminated against [her] when making its . . . decision, at a bare

66

minimum it suffices to defeat [the employer's] summary judgment motion." *Id*.

Here, BPD treated Doe differently than other former employees. BPD deviated from standard practice when they released Doe's records and personal information. BPD also at times failed to cooperate with background checks necessary for Doe to obtain future employment. *See, e.g.*, JA-2 396. For example, when a DHS investigator attempted to meet with Doe's BPD supervisors, he was rebuffed and could not complete one employment reference. JA-2 345; JA-6 2532. Finally, when a *Washington Post* reporter contacted BPD, they specifically targeted Doe to be highlighted within the article. JA-1 274.

Doe, at this stage, only bears the low burden of showing a prima facie case of retaliation as the first step of the burden shifting framework of *McDonnell-Douglas*. *See* 411 U.S. at 792. BPD's pattern of differential treatment and the close temporal proximity of adverse acts post-2017 meet this low bar.

67

## Conclusion

This Court should reverse the district court's order and remand Doe's

Title VII retaliation claim.

Respectfully submitted,

/s/ Aderson B. Francois

GEORGETOWN LAW                                    Lily Braafladt
   CIVIL RIGHTS CLINIC                          Sophie Gelber
600 New Jersey Ave.                              Shuyi Li
   NW, Suite 352                                Tucker Matus
Washington, D.C. 20001
(202) 661- 6721

*Counsel for*                                    *Student Counsel*
*Plaintiff-Appellant*

April 21, 2025

## Certificate of Compliance

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this document contains 12,194 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2025 in 14-point Palatino Linotype.

/s/ Aderson Francois

Aderson Francois

Counsel for Plaintiff-Appellant

April 21, 2025

## Certificate of Service

I hereby certify that on April 21, 2025, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.


/s/ Aderson Francois

Aderson Francois

Counsel for Plaintiff-Appellant

**ADDENDUM**

# Table of Contents

January 13, 2025 District Court Memorandum and Order Granting
  Defendants' Motion for Summary Judgment (ECF 126) ....................Add. 1
January 13, 2025 District Court Judgment Ordering Dismissal of Plaintiff's
  Action (ECF 127) ......................................................................................Add. 16

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 21-11062-MJJ |
| | ) |
| CITY OF BOSTON, BOSTON POLICE | ) |
| DEPARTMENT, and INDIVIDUAL | ) |
| OFFICERS, in their individual capacities, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>MEMORANDUM OF DECISION</u>

January 13, 2025

JOUN, D.J.

On October 19, 2020, plaintiff Jane Doe ("Doe") filed suit against the City of Boston

("City"), Boston Police Department ("BPD"), and unnamed Individual Officers (collectively,

"Defendants").[1] [Doc. No. 3]. Doe—a former BPD officer—alleged Defendants had retaliated

against her for reporting being raped by a fellow officer and provided false and negative

employment references to prospective employers. Specifically, Plaintiff asserted claims under

Title VII, 42 U.S.C. § 1983, and common law intentional infliction of emotional distress. Upon

Defendants' Motion to Dismiss, this Court had previously dismissed Doe's § 1983 claim and

limited Doe's remaining Title VII and emotional distress claims to acts taken after February 2,

---

[1] This Court has held that the City is the only proper institutional defendant, as "BPD is a municipal department and is not an entity that can be sued." [Doc. No. 43 at 1 n.1]. Regarding the unnamed Individual Officers, "there is no individual employee liability under Title VII." *Fantini v. Salem State Coll.*, 557 F.3d 22, 31 (1st Cir. 2009).

2017. [Doc. No. 43]. The Court also limited Doe's emotional distress claims to only those arising under the law of the District of Columbia. [*Id.* at 11].

On June 14, 2024, Defendants filed a Motion for Summary Judgment on all counts. [Doc. No. 102]. For the reasons set forth below, Defendants' Motion for Summary Judgment is <u>GRANTED</u>.

## I.    BACKGROUND

### A.    <u>Underlying Allegations and Related Investigations/Charges</u>

On June 25, 2007, Jane Doe joined BPD when she started at the Academy. [Doc. No. 117, Statement of Material Facts, at ¶ 33]. She graduated from the Academy in December 2007 and was appointed to a probationary police officer position. [*Id.*]. In September 2009, Doe was accepted into the Mobile Operations Unit ("MOP"), a specialized unit of motorcycle officers within BPD's SWAT team operations. [*Id.* at ¶ 36].

On September 23, 2009, Doe informed her husband, Michael Doe, that she had become pregnant after a fellow officer and veteran of the SWAT team, Michael Spence, raped her a month prior on August 25, 2009, while they attended a shooting competition in Farmington, Connecticut. [*Id.* at ¶ 39]. She said that Spence continued to sexually assault her on other occasions after they returned to Boston, threatening to shoot her husband if she did not comply and keep the assault a secret. [*Id.*]. On or around September 23 or 24, 2009, Doe reported the alleged rape to officials at BPD. [*Id.* at ¶ 40]. Shortly thereafter, Doe and Spence surrendered their private and duty firearms to BPD, and they were both placed on paid administrative leave. [*Id.* at ¶¶ 41, 45, 47]. Spence was declared fit to return to duty in November 2009. [*Id.* at ¶ 50]. Doe remained on paid administrative leave until January 2010, when BPD removed Doe from paid leave and required her to use her sick and accrued time. [*Id.* at ¶ 62]. After Doe used up her

**Add. 2**

sick and accumulated time, she was placed on unpaid leave until BPD assigned her to light duty in June 2010. [*Id.* at ¶ 63]. While on light duty, Doe was transferred from MOP to a new district where she would perform administrative work. [*Id.* at ¶ 66].

BPD's investigations of Doe's allegations were assigned to two units: the Anti-Corruption Unit ("ACU"), tasked with investigating all criminal activity by any City employee, and the Sexual Assault Unit ("SAU"), tasked with investigating sex crimes. [Doc. No. 117 at ¶ 68]. From these investigations, BPD determined that Doe and Spence had a "consensual sexual relationship;" it could not prove that a sexual assault had occurred. [*Id.* at ¶ 75]. On November 2, 2010, the Suffolk County District Attorney's Office announced it had found insufficient evidence to bring criminal charges against Spence. [*Id.* at ¶ 76]. Investigations were also opened at the Farmington Police Department in Connecticut and the Milton Police Department in Massachusetts, and both departments likewise closed their investigations without bringing charges against Spence. [*Id.* at ¶ 77].

In October 2012, then-Sergeant Detective Philip Owens of the ACU filed a complaint with Internal Affairs Department ("IAD"), alleging that Doe had committed various violations of BPD rules. [*Id.* at ¶¶ 18, 88]. IAD then issued a report recommending that 65 rule violations be sustained against Doe.[2] [*Id.* at ¶¶ 19, 89-90]. The recommendation of the IAD report went up the chain of command, and the charges were sustained at all levels, leading up to and including the

---

[2] IAD investigations into officer misconduct result in one of four recommended findings: 1) "sustained," meaning the investigation disclosed sufficient evidence to support allegations in the complaint; 2) "not sustained," meaning the investigation failed to prove or disprove the allegations in the complaint; 3) "exonerated," meaning the action complained of in the complaint did occur, but the investigation revealed that the action was proper, legal, and reasonable; or 4) "unfounded," meaning the investigation revealed that the conduct complained of did not occur. [Doc. No. 117 at ¶ 2]. The recommended findings are made by the ranking officer involved in the IAD investigation, and the IAD report containing the recommended findings for each charge is then forwarded up the chain of command for final approval. [*Id.* at ¶¶ 3-4]. These recommendations become final upon sign-off by the police commissioner. [*Id.* at ¶ 5; Doc. No. 105-25 at 17].

3

**Add. 3**

BPD Commissioner on July 13, 2013. [*Id.* at ¶ 20; Doc. No. 105-13; Doc. No. 105-14; Doc. No. 105-25 at 17]. As a result of the charges being sustained, BPD determined that the discipline to be imposed against Doe was the termination of her employment. [Doc. No. 117 at ¶ 21].

Once BPD determines the discipline to be imposed, if the discipline is greater than a five-day suspension, the officer has the right to an administrative internal appeal hearing. [*Id.* at ¶ 7]. Doe appealed the decision in her case with union representation. [*Id.* at ¶ 22]. While her appeal was pending at the internal hearing stage, but before a decision was issued, Doe resigned from BPD, effective May 2014. [*Id.* at ¶ 23; Doc. No. 105-17]. BPD classified her resignation as a resignation with charges pending, and Doe acknowledged and understood that her resignation would be classified as such. [Doc. No. 117 at ¶ 24].

### B. <u>Officer Doe's Job Applications Since February 2, 2017</u>

Since February 2, 2017, Doe had submitted upwards of 40 applications for jobs, primarily in the law enforcement field. [Doc. No. 117 at ¶¶ 27, 31]. As part of these applications, on at least six occasions, Doe had executed authorizations requesting that her former employers release to her prospective employer employment-related information about her. [*Id.* at ¶¶ 28-29].

BPD regularly receives requests for information regarding the employment of former employees from prospective employers, typically other law enforcement agencies. [*Id.* at ¶ 10]. BPD does not have written rules and procedures under which the department provides information to a requesting agency. [*Id.* at ¶ 12; Doc. 113-9 at 9; Doc. No. 113-10 at 57]. In practice, BPD will not release information about police officer disciplinary status to third parties unless it receives an authorization executed by the former employee, or unless the information is subject to a public records request. [Doc. No. 117 at ¶¶ 11, 16]. At BPD, requests for former employee information fall within the purview of Human Resources ("HR"), which is housed

within the Bureau of Administration and Technology ("BAT"). [*Id.* at ¶ 12]. The Superintendent of BAT, Robert Ciccolo, testified that when BPD receives a background check request, he decides which BPD unit should handle it: "General personnel orders would go to HR. Internal affairs records would go to Professional Standards." [Doc. No. 113-9 at 18]. Upon checking for an authorization releasing the requested information, HR produces a copy of the employee's personnel folder, which includes a background investigation file from the initial hiring, a section containing transfer orders, a section containing medical data, a section containing training materials, and personnel orders. [*Id.* at 19-20]. Relative to requests for Internal Affairs records, the Chief of the Bureau of Professional Standards ("BPS"), Phillip Owens, testified that BPD typically provides the requester with the employee's last known status and her disciplinary résumé, indicating if charges were ever brought against her, and if so, their disposition. [Doc. No. 117 at ¶ 12; Doc. No. 113-10 at 56; Doc. No. 113-9 at 21]. BPD would only provide supplemental information about charges on a disciplinary résumé if specifically requested. [Doc. No. 113-10 at 58].

In Doe's case, upon receipt of an authorization from a potential employer, BPD responded with Doe's disciplinary résumé, indicating the disciplinary charges against her, that those charges were sustained by an IAD investigation, and that Doe resigned with those charges pending. [Doc. No. 117 at ¶ 29]. In one instance, Doe applied to work for the United States Department of Homeland Security ("DHS"); upon request, the IAD provided Doe's disciplinary resume to DHS. [Doc. No. 124-1 at 13]. DHS sent an investigator to BPD headquarters to further verify Doe's employment, where the investigator was permitted to review Doe's internal disciplinary record, which was not contained in her employment file. [*Id.* at 13-14]. Doe has also testified that, on occasion, BPD officials discussed Doe's background with prospective

**Add. 5**

employers and provided negative information. [Doc. No. 117 at ¶ 29; Doc. No. 105-11 at 26-27]. In some instances, Doe withdrew her applications from consideration or otherwise did not pursue those positions. [Doc. No. 117 at ¶ 32].

## C.  Washington Post

On March 7, 2017, in response to a public records request by the Washington Post, BPD produced a list of "[t]he names of police officers who since Jan. 1, 2014 to the present have been separated from the department in lieu of termination, discipline, penalty, or proposed termination." [Doc. No. 105-22 at 3]. Doe's name was included on this list. [*Id.* at 4, 6]. Doe testified that, in addition to including Doe's name on this list, BPD officials highlighted her name for Washington Post reporters to specifically contact and attempt to put in an article. [Doc. No. 105-11 at 46]. Doe's name was ultimately not included in the resulting article. [*Id.* at 47; Doc. No. 105-23].

## D.  Procedural History

In August 2012, Doe filed suit against BPD in Massachusetts Superior Court, Case No. 1284CV03149, alleging discriminatory and tortious conduct. [Doc. No. 117 at ¶ 26]. That suit was dismissed in September 2013 for failure to timely respond to discovery requests. [*Id.*].

In May 2016, Doe filed a second suit against BPD in Massachusetts Superior Court, Case No. 1684CV01434, alleging discrimination under Mass. Gen. Laws c. 151B, violation of the Massachusetts Civil Rights Act, interference with advantageous contractual relations, defamation, retaliation in violation of Title VII and chapter 151B, and intentional and negligent outrage. [*Id.*; Doc. No. 43 at 3]. In part, the complaint alleged that Doe had been prevented from obtaining employment elsewhere due to "derogatory and defamatory statements" made by the defendants "leading directly to the refusal of an out of state police department to hire her in

6

October of 2013 and on divers occasions since that time." [Doc. No. 43 at 4]. The action was dismissed for failure to effect timely service, and Doe did not file for reconsideration or appeal after entry of final judgment. [*Id.*].

On February 2, 2017, Doe filed a third action in Massachusetts Superior Court, Case No. 1784CV00350, identical to the 2016 case. [*Id.*]. The defendants moved to dismiss on the ground that Doe's complaint had already been adjudicated on the merits in the 2016 action. A Superior Court judge dismissed the case, concluding that under Mass. R. Civ. P. 41(b)(3), "any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication on the merits," such that dismissal of the 2016 case was a dismissal with prejudice. [Doc. No. 43 at 4]. Doe appealed the Superior Court's dismissal, but the appeal was denied for want of prosecution. [*Id.*].

Doe initiated the present action in the United States District Court for the District of Columbia on October 19, 2020, asserting three claims: retaliation in violation of Title VII (Count I), violation of her First Amendment right to be free from retaliation under 42 U.S.C. § 1983 (Count II), and intentional infliction of emotional distress (Count III). [Doc. No. 3]. Upon Defendants' motion, the District Judge transferred the matter to this district, concluding that the court lacked personal jurisdiction over Defendants. [Doc. Nos. 20-21]. Defendants thereafter moved to dismiss for failure to state a claim. [Doc. No. 30]. On March 15, 2022, this Court dismissed Doe's Title VII claims relating to any allegedly retaliatory acts taken prior to February 2, 2017—the date of filing of the 2017 Superior Court action—noting:

> Doe is in effect requesting that this court overturn both the Superior Court judgment dismissing her 2016 complaint with prejudice and the later Superior Court decision finding that the 2016 judgment was a final adjudication on the merits under Massachusetts law. The court is not at liberty to revisit these issues.

[Doc. No. 43 at 8 (Talwani, D.J.)]. "However, insofar as Doe's claims relate to acts allegedly taken *after* February 2, 2017, they are not precluded," because such claims were not mature at the time the Superior Court actions were filed. [*Id.* at 8-9]. Doe's § 1983 claim was also dismissed in its entirety. [*Id.* at 9-10]. And the Court dismissed any claim for intentional infliction of emotional distress arising under Massachusetts law but, noting that the parties had not adequately briefed the choice of law issue, permitted the claim to proceed under law of the District of Columbia where the alleged conduct occurred after February 2, 2017. [*Id.* at 10-11].

On June 14, 2024, Defendants moved for summary judgment. [Doc. No. 102]. The matter was fully briefed, and the Court heard arguments from the parties on November 20, 2024. [Doc. No. 121].

## II.  STANDARD

Summary judgment is appropriate when, based upon the pleadings, affidavits, depositions, and other materials in the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." *Vineberg v.*

**Add. 8**

*Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (cleaned up). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (quoting *Anderson*, 477 U.S. at 252). Further, the party opposing summary judgment may not rely on—and the Court may not consider—"conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Clarendon Nat'l Ins. Co. v. Philadelphia Indem. Ins. Co.*, 954 F.3d 397, 404 (1st Cir. 2020). In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990).

### III.     ANALYSIS

#### A.   Title VII Retaliation Claim

"Title VII expressly forbids not only direct discrimination, but also retaliation against an individual who has complained about discriminatory employment practices." *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 114-15 (1st Cir. 2024) (quoting *Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 72 (1st Cir. 2011)). A prima facie Title VII retaliation case exists if the plaintiff establishes that "(1) the plaintiff engaged in protected conduct, (2) the employer took an adverse employment action, which was (3) in response to the employee's protected activity." *Id.* at 115. "From there, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions," and then "the plaintiff must show that the defendant's explanation is a pretext for unlawful retaliation." *Id.* (cleaned up).

To survive summary judgment on her Title VII claim, Doe must "raise a genuine issue of fact as to whether retaliation motivated the adverse employment action. . . . [A] reasonable jury

must be able to conclude that retaliatory animus was the but-for cause of the adverse action." *Id.*
(cleaned up).

### 1. **Prima Facie Case of Retaliation**

Defendants concede that Doe has established the first element of a prima facie case—i.e.,
that she engaged in protected conduct by reporting sexual assaults she allegedly suffered while
employed by BPD. [Doc. No. 103 at 9 n.2]. But they contest that BPD engaged in any adverse
employment action in response to Doe's protected activity. I agree with Defendants and find that
Doe has produced no evidence which would permit a reasonable jury to resolve the retaliation
claim in her favor.

Doe argues that BPD's post-February 2017 release of her disciplinary record constitutes
an adverse employment action, primarily on the basis that the information contained in her
record was "originally discriminatory, retaliatory, and tortious." [Doc. No. 111 at 3]. In so
arguing, Doe posits that "the central issue in this case is whether the information in [Doe's
personnel] file was placed there in retaliation for Doe's complaint of having been raped. [*Id.* at
21]. However, as this Court has already held, it is not at liberty to revisit any allegedly retaliatory
acts that took place prior to Doe's filing of her Superior Court complaint on February 2, 2017,
where Doe already litigated those claims to final judgment in multiple Superior Court actions.
*See* [Doc. No. 43 at 8]. In so holding at the motion to dismiss stage, this Court clarified that
"both the instant complaint and the 2016 and 2017 actions seek redress for the same alleged
wrongs, i.e., that in retaliation for Doe's report that she was sexually assaulted by a fellow
officer, the BPD provided false information to Doe's prospective employers, thereby preventing
or jeopardizing her future employment"—thus any such claims based on BPD conduct up to
February 2, 2017, must be barred. [*Id.* at 7-8]. BPD's pre-2017 conduct may be taken into

**Add. 10**

account "only to the extent it was legally relevant to what later happened—for example, to help prove the intent behind an act committed after [February 2, 2017], or the act's likely effect on someone like [Doe]." *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 439 (1st Cir. 1997). But such time-barred acts cannot be used as a substitute for proof of actual retaliation during the relevant time period. *Thurston v. Henderson*, 230 F.3d 1347, 1 (1st Cir. 2000) (unpublished).

Contrary to Doe's assertions, the law of the case doctrine does not apply here to open up Doe's retaliation claim to pre-February 2017 acts. Doe relies upon this Court's prior Rule 12(b)(6) and discovery-related rulings, but such rulings were interlocutory and do not constitute law of the case. *See Pérez-Ruiz v. Crespo-Guillén*, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders, including denial of motions to dismiss, . . . do not constitute law of the case."); *see also* 8 Fed. Prac. & Proc. Juris. § 2006 ("A discovery order is[ ] an interlocutory order in the course of proceedings [that] is not appealable."). Moreover, the Court has never ruled directly on Doe's entitlement to post-2017 recovery based on BPD's pre-2017 acts; at most, the previous rulings simply acknowledge that BPD's pre-2017 acts may be relevant to the post-2017 claims at issue.

Turning to Doe's retaliation claims arising from BPD's conduct after February 2, 2017, such claims also fail because Doe has not produced any admissible evidence upon which a rational jury could find that BPD's disclosure of employment information to her prospective employers was retaliatory. This is so where (1) Doe authorized and requested that BPD disclose her employment information; and (2) the record contains no evidence that the manner in which BPD disclosed such information differed from its usual practice or could otherwise be reasonably characterized as adverse.

As to the first point, the record reflects that BPD generally discloses information about a former employee's employment upon receipt of an authorization form by the former employee to

**Add. 11**

do so, and that Doe signed such forms. [Doc. No. 117 at ¶¶ 10-11, 27-28]. Defendants claim that

Doe fully released BPD from all liability for such disclosures through those forms. [Doc. No.

103 at 4]. I note that Defendants produce only a small sample of such releases—from five

prospective employers, among the "upwards of 40 applications" Doe submitted, [Doc. No. 117 at

¶¶ 29, 31; Doc. No. 105-21]—and each one differs as to its language and extent of release. In any

event, this waiver argument need not be resolved where Doe cannot first establish liability. The

greater significance of the forms lies in the fact that, where Doe affirmatively authorized and

requested BPD to release her employment records to prospective employers, this undermines her

position that BPD then released her records as an adverse retaliatory act. On the record before

me, no reasonable jury could find that the City's "desire to retaliate was the but-for cause of the

challenged employment action." *Theidon v. Harvard Univ.*, 948 F.3d 477, 505 (1st Cir. 2020)

(citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013)).

    As to the second point, Doe has failed to produce any admissible evidence establishing

that the way BPD disclosed her employment and disciplinary information differed from its usual

practices or could otherwise be characterized as adverse. Doe relies largely on speculative,

hearsay testimony to make her case. For example, Doe alleges that, "[o]n occasions, BPD

officials discussed Doe's background with prospective employers and provided negative

information via telephone." [Doc. No. 117 at ¶ 29]. The only citation to the record is to Doe's

own deposition, wherein she testified learning that BPD had made phone calls to prospective

employer North Shore Community College stating that Doe had reported being raped by a BPD

officer and that the charges in her disciplinary record had been sustained against her. [Doc. No.

105-11 at 26-27]. But Doe further testified that she could not recall who told her this

information, nor could she recall the specifics of the conversation. [*Id.*]. Similarly, Doe testified

she was told by an investigator at the Honolulu Police Department that BPD had provided false information regarding her employment, but she could not "recall specifically in what form" she received this information, nor could she identify the person she spoke with. [Doc. No. 105-12 at 19-20]; *see also* [Doc. No. 105-11 at 43-44]. Doe did not depose any witnesses or identify any documents in the record that might corroborate her testimony. As another example, the Las Vegas Metropolitan Police Department stated in an email to Doe that "[y]our resignation in lieu of termination from a police agency for sustained conduct makes you permanently ineligible for employment with LVMPD." [*Id.* at 32]. At oral argument, Doe's counsel asserted that Doe's resignation status had changed from "resignation with charges pending" to "resignation in lieu of termination," reflecting a retaliatory intent from BPD. But when asked about this change in resignation status, Doe testified, "I do not know specifically where they got that language from," [*id.*]—and produced no other evidence to support the allegation that BPD had changed Doe's resignation status on her records or that it did so with the intent of interfering with her employment applications.

Post-hearing, in supplementation of the record, Doe produced a background investigation report of herself conducted by DHS, dated November 16, 2017. [Doc. No. 124]. The report reflects that a DHS investigator received Doe's disciplinary résumé, produced by BPD per its usual practice in responding to requests for information, "summarizing three cases which had been investigated and 65 counts of misconduct charges." [Doc. No. 124-1 at 13]. The DHS investigator then physically went to BPD headquarters "to obtain verification of [Doe's] employment with the Boston Police Department." [*Id.*]. When asked for Doe's personnel records, BPD officials directed the DHS investigator to Internal Affairs regarding Doe's "internal disciplinary record, which is not contained in her employment file." [*Id.*]. Doe argues that this

demonstrates BPD departed from its standard practices in responding to prospective employers' requests for information. But this excerpt, without anything further to corroborate Doe's interpretation, cannot alone provide the basis for a jury to find retaliation. The investigator was never deposed, nor were any other witnesses involved; Doe cannot establish why the investigator went to BPD headquarters, what information DHS sought, what BPD informed the investigator, why BPD directed the investigator to the disciplinary file, or what BPD's typical practice would be when an investigator requests information beyond the disciplinary résumé. *See* [Doc. No. 113-10 at 58 (testifying BPD would provide supplemental information about charges on a disciplinary résumé if specifically requested)].

At bottom, Doe's speculative, hearsay testimony cannot create a factual dispute to defeat summary judgment. *See Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted." (cleaned up)); *Irobe v. United States Dep't of Agric.*, 890 F.3d 371, 381 (1st Cir. 2018) ("A court need not take at face value a party's subjective beliefs, even if offered in the form of testimony, if those subjective beliefs are conclusory, self-serving, and lack factual support in the record." (cleaned up)); *see also Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) ("Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56(e), even when proffered . . . by one who claims to have been a participant."). Her retaliation claim based on BPD's interactions with her potential employers after February 2, 2017 thus cannot stand.

The Complaint additionally claimed BPD had retaliated against Doe by providing information to the Washington Post stating "she had essentially been terminated from BPD." [Doc. No. 3 at ¶ 43]. As Defendants note, the record contains no evidence to support this

retaliation claim. Pursuant to a public records request, BPD released records accurately reflecting

Doe had resigned with charges pending. [Doc. No. 105-22]. Doe's name ultimately did not

appear in the ensuing article, and there is no evidence in the record that this interaction with the

Washington Post negatively affected her then-employment. [Doc. No. 105-11 at 45-46].

Accordingly, Doe's retaliation claim related to the Washington Post also fails.

**B.  <u>Intentional Infliction of Emotional Distress Claim</u>**

As to Doe's intentional infliction of emotional distress claim, as previously noted, the

claim was barred to the extent that it arose under Massachusetts law, allowed only to the extent it

arose under the law of the District of Columbia and was based on conduct occurring after

February 2, 2017. [Doc. No. 43 at 11]. Under D.C. law, a prima facie case of intentional

infliction of emotional distress requires Doe to prove "[e]xtreme and outrageous conduct," "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Salem*

*Media Grp., Inc. v. Awan*, 301 A.3d 633, 656 (D.C. 2023). As set forth above, Doe has failed to

make any such showing. The record reflects only that Doe authorized and requested BPD to

produce her employment and disciplinary records to her prospective employers, and that BPD

did so in compliance with its usual practices.

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is <u>GRANTED.</u>

SO ORDERED.

> /s/ Myong J. Joun
> United States District Judge

**Add. 15**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **Jane Doe** | ) |  |
| Plaintiff, | ) | **1:21-cv-11062-MJJ** |
| **v.** | ) |  |
|  | ) |  |
| **City of Boston et al.** | ) |  |
| Defendant | ) |  |
|  | ) |  |

## JUDGMENT

January 13, 2025

**Joun, D.J.**

In accordance with the Court's Memorandum of Decision entered and dated

January 13, 2025, it is hereby **ORDERED** that this action is dismissed.


**/s/ Myong J. Joun**
Myong J. Joun
United States District Judge


**Add. 16**